```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
              Case No. 15-20140-Cr-GRAHAM

UNITED STATES OF AMERICA,      ) Pages 1-68
                               )
               Plaintiff,      )
                               )
        -v-                    )
                               )
DOMENICK JAGNE,                )
                               ) Miami, Florida
               Defendant.      ) May 5, 2015
                               ) 9:30 a.m.



           TRANSCRIPT OF TESTIMONY OF COREY COUTO

          AT HEARING ON MOTION TO SUPPRESS

         BEFORE THE HONORABLE ANDREA M. SIMONTON

              U.S. MAGISTRATE JUDGE


APPEARANCES:

For the Government        MATTHEW J. LANGLEY and MARIA MEDITIS
                          Assistant U.S. Attorneys
                          99 Northeast 4th Street
                          Miami, Florida  33132-2111


For the Defendant         CHRISTINE O'CONNOR
                          Assistant Federal Public Defender
                          150 West Flagler Street
                          Miami, Florida  33130


REPORTED BY:              WILLIAM G. ROMANISHIN, RMR, FCRR, CRR
(305) 523-5558            Official Court Reporter
                          400 North Miami Avenue
                          Miami, Florida  33128
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1              (Call to order of the Court)
 2        *    *    *    *    *    *    *    *    *    *
 3        COREY COUTO, GOVERNMENT WITNESS, SWORN
 4              THE COURTROOM DEPUTY:  Thank you.  Please be seated.
 5   Speak into the microphone.  State your name.  Spell your first
 6   and last name for the record.
 7              THE WITNESS:  My name is Corey Couto.  C-o-r-e-y.
 8   Last name C-o-u-t-o.
 9              THE COURT:  You can proceed, Mr. Langley.
10              For the record, I have admitted Government's Exhibits
11   1 through 9 based on the stipulation of the parties, so you
12   don't need to lay a foundation.
13              MR. LANGLEY:  Thank you, Your Honor.
14              (Government's Exhibits 1 through 9 in evidence)
15                           DIRECT EXAMINATION
16   BY MR. LANGLEY:
17   Q.  Good morning, Officer Couto.
18          Can you tell the Court where it is that you work?
19   A.  I work for the City of Miami Police Department.
20   Q.  And what did you do before you worked for the Miami City
21   Police Department?
22   A.  I was a bank teller for Wells-Fargo.
23   Q.  And what did you do before that?
24   A.  I was an assistant manager for Family Dollar.
25   Q.  Where did you go to high school?
```

COUTO - Direct (Langley)

1  A.   Southwest Miami Senior High.

2  **Q.   Did you attend or do you attend a college?**

3  A.   Yes, I do.

4  **Q.   And where do you go?**

5  A.   Union Institute and University.

6  **Q.   And what do you study there?**

7  A.   Criminal justice.

8  **Q.   How long have you been with the Miami City Police**

9  **Department?**

10  A.   July 2013.

11  **Q.   What's your title there?**

12  A.   As a police officer.

13  **Q.   As a police officer, what are your duties and**

14  **responsibilities?**

15  A.   I'm a patrol officer, so I answer calls for service,

16  nonemergency 911, enforce the traffic laws, enforce the county

17  and the municipal law ordinance.

18  **Q.   And you say you patrol.   What area of the city do you**

19  **patrol?**

20  A.   Overtown.

21  **Q.   And how would you describe the Overtown area?**

22  A.   I would describe it as a predominantly black neighborhood.

23  **Q.   What about as far as crime?**

24  A.   It's a high-crime area, drug area as well.

25  **Q.   And you say you patrol.   Do you patrol alone?**

COUTO - Direct (Langley)

1   A.   Correct.

2   **Q.   Are you in a marked car?**

3   A.   Yes.

4   **Q.   Do you wear a uniform?**

5   A.   Correct.

6   **Q.   Let me turn your attention to February 23, 2015.  Were you**

7   **on patrol that day?**

8   A.   Yes.

9   **Q.   And what time did your shift begin that day?**

10  A.   9:00 p.m.

11  **Q.   Are you always on the 9:00 p.m. shift?**

12  A.   Correct.

13  **Q.   And what time does your shift end?**

14  A.   7:00 a.m.

15  **Q.   Did you just come off a shift now?**

16  A.   Yes, I did.

17  **Q.   All right.  Well, we won't keep you up too long.**

18          **How did your shift begin that day before you went on**

19  **patrol on February 23, 2015?**

20  A.   As normal, we begin with roll call.

21  **Q.   And explain to us, what is roll call.**

22  A.   Basically where all centralized patrol officers go and we

23  meet with our supervisor.

24  **Q.   And what happens at roll call?**

25  A.   We get our assigned unit numbers, basically our area of

COUTO - Direct (Langley)

1  assignment.

2  **Q.  Do they share any other information with you at roll call?**

3  A.  Correct.

4  **Q.  And what is that?**

5  A.  They share any BOLOs they have, be on the lookouts for,

6  and they also share any important information.

7  **Q.  Do you remember if any information was shared with you the**

8  **night of February 23rd?**

9  A.  Yes, I do.

10  **Q.  What information was shared?**

11  A.  My supervisor for Overtown told us that we've been --

12  there's been a high crime -- an increase of robberies in the

13  area of Northwest 3rd Avenue between 10th Street and 17th

14  Street.

15  **Q.  Is that the area that you patrol?**

16  A.  Correct.

17  **Q.  And is that the area where the incident occurred that's**

18  **the subject of this hearing?**

19  A.  Correct.

20  **Q.  Was there any other information that was shared with you**

21  **about these rash of robberies?**

22  A.  Correct.  She told us that the victims had provided some

23  type of the same MO with the suspects' information.

24  **Q.  What is that MO?**

25  A.  They're black males on a bicycle.

COUTO - Direct (Langley)

1    Q.   Do you often conduct stops of individuals on bicycles?

2    A.   Yes, I do.

3    Q.   And why is that?

4    A.   Basically it's to enforce the law.  If they have no

5    mounted headlight or reflector, I would conduct a traffic

6    stop.

7    Q.   And is there a reason for that?

8    A.   It's really for their safety.

9    Q.   What do you mean by that?

10   A.   Basically, it's from sunset to sunrise, you need to have a

11   mounted headlight for the drivers driving.  You can't see

12   them.

13   Q.   Is that a real concern, officer?

14   A.   I believe so, yes.

15   Q.   Are there incidents that cause you to be concerned about

16   the safety of bicyclists and drivers?

17   A.   Having encountered in the past fatalities as well and

18   bicyclists hit.

19   Q.   Now, let me direct you to the stop that's the subject of

20   the hearing today.  Approximately what time did you encounter

21   the defendant?

22   A.   Approximately 11:00 p.m.

23   Q.   And where were you traveling?

24   A.   I was traveling south on Northwest 3rd Avenue between 12th

25   Street and 11th Street.

COUTO - Direct (Langley)

1  **Q.  Officer, I'm going to hand you what has been admitted as**
2  **Government Exhibit 1.**
3            MR. LANGLEY:  May I approach, Your Honor?
4            THE COURT:  Yes.
5            You don't need to ask permission to approach.  But
6  show defense counsel and make sure she has what you're showing
7  the witness.
8            MR. LANGLEY:  Thank you.
9  BY MR. LANGLEY:
10  **Q.  Officer Couto, do you recognize Government's Exhibit 1?**
11  A.  Correct.
12  **Q.  And what is it?**
13  A.  It's a map of the area I was actually patrolling,
14  Northwest 3rd Avenue between 10th Street and 12th Street.
15  **Q.  Is it a Google printout of a map of that area?**
16  A.  That's correct.
17  **Q.  And does the representation fairly and accurately depict**
18  **the area that we're talking about?**
19  A.  Yes.
20  **Q.  Any alterations or deletions that would materially affect**
21  **the representation?**
22  A.  No.
23  **Q.  And so tell us again where were you traveling when you**
24  **encountered the bicycle and the stop.**
25  A.  I was traveling southbound on Northwest 3rd Avenue

COUTO - Direct (Langley)

1 approximately between 11th Terrace and 12th Street.

2 **Q.  And you were traveling in what direction?**

3 A.  I was traveling on the right line going southbound.

4 **Q.  And what did you encounter at that point?**

5 A.  At that point I observed a black male on a bicycle.

6 **Q.  Do you see the individual on the bicycle in the courtroom**

7 **here today?**

8 A.  That's correct.

9 **Q.  And where is he?**

10 A.  He's dressed in -- he's over there, yes, next to the

11 defense counsel.

12          MR. LANGLEY:  Let the record reflect that the witness

13 has identified the defendant, Domenick Jagne.

14          THE COURT:  Okay.  The record will so reflect.

15 BY MR. LANGLEY:

16 **Q.  And how far were you from the defendant when you were able**

17 **to see him on his bicycle?**

18 A.  I was about a car, car-and-a-half length behind the

19 defendant.

20 **Q.  Do you remember what he was wearing?**

21 A.  Yes, I do.

22 **Q.  What was he wearing?**

23 A.  He was wearing a white shirt and jean shorts and also a

24 skully, a black skully.

25 **Q.  Were you able to see clearly?**

COUTO - Direct (Langley)

1  A.  Yes.

2  **Q.  Did you have your lights on?**

3  A.  Yes.

4  **Q.  And where in the street was the defendant traveling?**

5  A.  The defendant was traveling right in front of my vehicle

6  on the right side of the lane going southbound as well.

7  **Q.  Was he in the street?**

8  A.  Yes, he was.

9  **Q.  Did you observe anything about the bicycle at that point?**

10 A.  I did.

11 **Q.  What did you observe?**

12 A.  At that point I observed that the bicycle had no reflector

13 on it.

14 **Q.  I'm going to hand you what has been marked for admission**

15 **as Government's Exhibit 2.**

16         **Do you recognize that, officer?**

17 A.  Yes.

18 **Q.  And what is that?**

19 A.  It is a photo of the defendant's bicycle.

20 **Q.  Is that a fair and accurate photo of the defendant's**

21 **bicycle as you saw it at the time of the incident?**

22 A.  That's correct.

23 **Q.  Are there any alterations to the photo or alterations to**

24 **the bicycle that would materially affect the way that you saw**

25 **it during your initial stop and all the way through the**

COUTO - Direct (Langley)

1    incident?

2    A.  No.

3    Q.  Is there a reflector on the back of the bicycle?

4    A.  No, there is not.

5    Q.  Did you continue to follow the defendant as he traveled

6    southbound on Northwest 3rd Avenue?

7    A.  Yes.

8    Q.  And what happened next?

9    A.  As we passed 11th Terrace, the defendant made a right-hand

10   turn to go westbound on 11th Street from Northwest 3rd Avenue.

11   Q.  So again, looking at Government's Exhibit 1, the Google

12   printout of the map, he would have taken a right going

13   westbound on Northwest 11th Street, is that correct?

14   A.  Yes.

15   Q.  And how far in back of the defendant were you when you

16   made the turn?

17   A.  I'm still maintaining that car length, car-and-a-half

18   length behind the defendant.

19   Q.  And as he made the turn, did you notice anything else

20   about the bicycle?

21   A.  Yes.

22   Q.  And what was that?

23   A.  I noticed that the bicycle did not have a front-mounted

24   headlight.

25   Q.  And if I can refer your attention back to Government's

1  **Exhibit 2, the picture of the bicycle, is there a front-**
2  **mounted headlight on the bicycle?**
3  A.  No.
4  **Q.  Is there a lamp on the front of the bicycle?**
5  A.  No.
6  **Q.  And again, is this the way that you observed the bicycle**
7  **as depicted in the photo?  Is that the same as the way you saw**
8  **the bicycle during this point and through the rest of the**
9  **incident?**
10 A.  Yes.
11 **Q.  You said you turned westbound on Northwest 11th Street.**
12 **Can you describe that street for me?**
13 A.  Yes.  It's a two-way, one-way, all traffic going
14 westbound.
15         THE COURT:  I didn't understand that.  You said it's
16 a two-way, one-way.  What is that?
17         THE WITNESS:  Correction.  There's two lanes -- it's
18 a one-way, both lanes going westbound.
19 BY MR. LANGLEY:
20 **Q.  Your right side of the street, the northbound side of the**
21 **street, what does that look like?**
22 A.  It's a fence and also alongside of the fence is a concrete
23 wall which is an overground Metromover.
24 **Q.  And were there any residences or businesses on the right**
25 **side of the street?**

1    A.   No, there is not.

2    Q.   **What did your left side, the southbound side of the**

3    **street, look like?**

4    A.   On the left side near the 3rd Avenue intersection there's

5    a church.   Next to the church there's a construction site.

6    Once you pass the construction site, there is two apartment

7    complexes.

8    Q.   **How big are those apartment complexes?**

9    A.   The first one, the first address I'm going to give is 42.

10   It's about a two-story apartment building.

11   Q.   **And when you made the right on to Northwest 11th Street,**

12   **what did you do next?**

13   A.   As we were both traveling, my windows are actually down.

14   I had given a verbal command towards the defendant to stop.

15   Q.   **And how loud was that verbal command?**

16   A.   It was loud enough for him to hear me.

17   Q.   **How did you know he heard you?**

18   A.   I saw the defendant look back towards me.

19   Q.   **Did you make eye contact with him?**

20   A.   Yes.

21   Q.   **And where was the defendant riding at that point?**

22   A.   The defendant was still riding, maintaining his lane on

23   the right side of the roadway.

24   Q.   **And when he heard your command, what did the defendant do**

25   **next?**

 1  A.   The defendant then made -- he started swerving towards the
 2  curbside of the street.
 3  **Q.   I'm going to hand you what has been marked for admittance**
 4  **as Government Exhibit 3.**
 5          **Officer Couto, do you recognize Government's Exhibit**
 6  **3?**
 7  A.   Yes.
 8  **Q.   And what is that?**
 9  A.   It is a photo of Northwest 11th Street facing westbound.
10  In the photo you can see the defendant's bike where he placed
11  it behind the Ford Explorer.
12  **Q.   And does this accurately represent both where he laid the**
13  **bike and the street as it looked that night?**
14  A.   Yes.
15  **Q.   Had the bicycle been moved from the spot where he**
16  **initially laid it to the time this photograph was taken?**
17  A.   No, it had not.
18  **Q.   So the entire time the bike was laid in back of the Ford**
19  **Explorer?**
20          **MS. O'CONNOR:  Objection to leading.**
21          THE COURT:  Sustained.
22  BY MR. LANGLEY:
23  **Q.   Where did he place the bicycle?**
24  A.   The bicycle was left there entirely.
25  **Q.   And in this photograph, where were you?**

COUTO - Direct (Langley)

```
 1  A.  I was right behind the picture.
 2  Q.  So the photograph doesn't depict your marked cruiser.
 3  A.  That's correct.
 4  Q.  So where would the marked cruiser have been?
 5  A.  Right behind where the photo was taken.
 6  Q.  Is this photo taken from the viewpoint or the
 7  perspective --
 8          MS. O'CONNOR:  Objection to leading.
 9          THE COURT:  Sustained.
10  BY MR. LANGLEY:
11  Q.  What perspective is this photograph taken -- from what
12  perspective?
13  A.  It's taken right in front of my marked vehicle.  It's
14  actually facing westbound.
15  Q.  And while the defendant was pulling his bicycle over to
16  the curb as depicted in this photograph, what were you doing?
17  A.  I was also moving alongside with him, following him while
18  he was going towards the right.
19  Q.  And following in your patrol car?
20  A.  Yes.
21  Q.  And how far away were you at that point?
22  A.  At that point I was approximately maybe a car length
23  still, maybe a car-and-a-half length as well.
24  Q.  When he laid the bike down, what did you do next?
25  A.  As he was laying down the bike, I observed the defendant
```

COUTO - Direct (Langley)

1   make an overt action, like a quick movement to get off his
2   bicycle.  At that point I had some red flags go up saying, you
3   know, I'm thinking that he's going to take flight.  So, as
4   soon as he's placing down the bicycle, I'm putting my marked
5   vehicle on park and I'm also getting out of the vehicle.
6   **Q.  And timewise, as he's moving, when are you moving?**
7   A.  At the same time.
8   **Q.  And how fast are you moving?**
9   A.  Pretty quickly.
10  **Q.  Did you lose sight of the defendant at any time?**
11  A.  No, I did not.
12  **Q.  Once defendant laid the bike down, what did the defendant**
13  **do next?**
14  A.  As soon as the defendant laid down the bike, defendant
15  took like a dart motion towards the side of the vehicle,
16  towards the right passenger side of the vehicle.
17  **Q.  And what did you do?**
18  A.  As soon as he did that, I came out of my vehicle crossing
19  in front of my marked police vehicle towards the right
20  passenger side, keeping a clear and unobstructed view of the
21  defendant.
22  **Q.  And when you say right passenger side, that's your right**
23  **side of the roadway?**
24  A.  Correct.
25  **Q.  That's the north side of the street?**

COUTO - Direct (Langley)

1    A.   Correct.

2    **Q.   I'm going to hand you what has been admitted as**

3    **Government's Exhibit 4.**

4            **Do you recognize Government's Exhibit 4, Officer**

5    **Couto?**

6    A.   That's correct.

7    **Q.   What is that?**

8    A.   It's another photo closeup of Northwest 11th Street facing

9    westbound of the defendant's photo being placed behind the

10   Ford Explorer.

11   **Q.   And had this photo been altered at all or changed at all**

12   **from the point where the actual incident occurred?**

13   A.   No, it had not.

14           THE COURT:  You said it was a closeup of the

15   defendant.  I don't see the defendant in the photograph.

16           THE WITNESS:  Correction, Your Honor.  Defendant's

17   bicycle.

18           THE COURT:  Okay.  Thank you.

19   BY MR. LANGLEY:

20   **Q.   And when you got to the back of the Ford Explorer, where**

21   **were you standing?**

22   A.   I was standing -- it doesn't really -- the picture

23   doesn't -- I was standing right behind the bicycle.

24   **Q.   And where was the defendant?**

25   A.   Defendant was actually right by the front passenger wheel.

COUTO - Direct (Langley)

1   **Q.   And what did you see the defendant doing?**

2   A.   Defendant bent over and took his right hand with an

3   unknown object and placed it inside the right wheel well, the

4   front right wheel well.

5   **Q.   You say unknown.   Were you able to see what the object**

6   **was?**

7   A.   No, I was not.

8   **Q.   What was the lighting like at that point?**

9   A.   It was like -- there was floodlight from the streets and

10  as well from my marked vehicle.

11  **Q.   Were you able to see the defendant clearly?**

12  A.   Yes.

13  **Q.   And what did you do or say when you saw the defendant make**

14  **the movement?**

15  A.   I actually unholstered my weapon and I pointed it at the

16  defendant.

17  **Q.   And why did you do that?**

18  A.   For officer safety.   I did not know what he had in his

19  hand.

20  **Q.   And what did you say to the defendant at that point?**

21  A.   I don't recall.

22  **Q.   Did you say something?**

23  A.   Yes.

24  **Q.   What did the defendant do after that?**

25  A.   As soon as the defendant placed that unknown item or

1  object on the wheel well, the defendant took flight in a

2  northbound direction -- in a westbound direction, correction.

3  **Q.  Away from you?**

4  A.  Correct.

5  **Q.  And on the map, I believe it shows an underpass on 11th**

6  **Street, westbound on 11th Street.**

7  **Is that the direction he fled to?**

8  A.  Yes.

9  **Q.  And what did you do?**

10  A.  As soon as he took flight, I holstered my weapon and I

11  took flight after him.

12  **Q.  How far behind were you when you finally took flight?**

13  A.  Approximately a car length.

14  **Q.  And was he moving quickly?**

15  A.  Yes, he was.

16  **Q.  And were you moving quickly as well?**

17  A.  Yes.

18  **Q.  I'm going to hand you what has been marked for purposes of**

19  **identification and for admittance as Government's Exhibit 5.**

20  **Officer Couto, do you recognize Government's Exhibit**

21  **5?**

22  A.  Yes, I do.

23  **Q.  And what is it?**

24  A.  It's a picture of Northwest 11th Street facing eastbound.

25  **Q.  So this picture is facing eastbound.  Maybe you can orient**

1    myself and the Court.

2             So the left-hand side of the picture depicts what?

3    A.   It's actually a fenced area and also a concrete wall.

4    Q.   So is that the north side of the street?

5    A.   Yes.

6    Q.   North side of Northwest 11th Street?

7    A.   Yes.

8    Q.   And I see in the distance of this photograph blue and red

9    lights and headlights on what appears to be a vehicle.  What

10   is that?

11   A.   That is a marked police vehicle.

12   Q.   Is that your marked police vehicle?

13   A.   No.

14   Q.   What appears in front of that marked police vehicle, the

15   vehicle directly in front of it?

16   A.   That is my marked police vehicle.

17   Q.   And what is the vantage point that this photograph is

18   being taken from?

19   A.   From -- rephrase that question.

20   Q.   What vantage point is this photograph being taken from?

21   A.   From where the defendant was possibly stopped from, where

22   I detained him.

23   Q.   Okay.  So let's go back to the flight.

24             THE COURT:  Okay.  Before we get to that, let me just

25   clarify the picture.

COUTO - Direct (Langley)

1        MR. LANGLEY:  Sure.

2        THE COURT:  On the left-hand side of the photo I see

3   a car that has two headlights on it followed by a slight gap,

4   followed by another car that appears to be an SUV.

5        Which of the cars was your car?

6        THE WITNESS:  Your Honor, my car is with the

7   headlights on.

8        THE COURT:  Okay.  And the red and blue lights above

9   that are not from your car?

10       THE WITNESS:  No, ma'am.  That's from another Miami

11  police vehicle.

12       THE COURT:  And that vehicle is where?

13       THE WITNESS:  It's right behind my vehicle.

14       THE COURT:  Okay.  So the two headlights are your

15  car, then there's a police car with red and blue lights behind

16  that, and then in front of your car there's a gap that shows

17  another car.

18       Is that car that's in front of your car the Ford

19  Explorer?

20       THE WITNESS:  That is the Ford Explorer.

21       THE COURT:  Okay.  Thank you.  I just wanted to

22  clarify that because it wasn't clear to me what car you were

23  talking about was your car.

24       MR. LANGLEY:  Thank you, Your Honor.

25       THE COURT:  Thank you.

COUTO - Direct (Langley)

1   BY MR. LANGLEY:

2   **Q.   Let's go back to the flight.   You were taking flight after**

3   **the defendant.   And which direction did he run?**

4   A.   He ran westbound from the Ford Explorer, at which point a

5   few steps into it he took flight towards the south side of the

6   street, of Northwest 11th Street.

7   **Q.   So, if I'm looking at Government's Exhibit 5, the**

8   **photograph in Government's Exhibit 5, he would have been**

9   **traveling towards the perspective of the photograph?**

10  A.   Yes.

11  **Q.   And in which direction, left to right or right to left,**

12  **would he have been traveling as well?**

13  A.   At a diagonal from right to left.

14  **Q.   From right to left or left to right?**

15  A.   From right to left -- well, from the picture it's gonna be

16  left to right, correction.

17  **Q.   Okay.   So from the picture it's going to be from which**

18  **direction?**

19  A.   From left to right.

20  **Q.   From northbound to southbound?**

21  A.   That's correct.

22  **Q.   Okay.   And while he was running, what were you doing?**

23  A.   I was running right behind him.

24  **Q.   And how far behind him were you at that point?**

25  A.   Approximately ten feet behind him.

COUTO - Direct (Langley)

1   **Q.   And what did you do next, if anything?**

2   A.   As soon as he took flight, like I mentioned, I holster my

3   weapon.   I gave him several commands to stop running.   At that

4   point I transition to my Taser.   I unholster my Taser.   At

5   that point we're already on the sidewalk of the south side of

6   the street, of Northwest 11th Street.   When I pointed the

7   Taser at him, I told him stop running, I'm police.   If you

8   keep running, I'm going to tase you.

9           At that point the defendant stopped running.   He put

10  his hands up.   He turned around.   He looked at me and he

11  complied to all my verbal commands.

12  **Q.   And so you made several commands for him to stop, if I**

13  **understand.**

14  A.   That's correct.

15  **Q.   And upon the initial command for him to stop, did he heed**

16  **that command?**

17  A.   No, he did not.

18  **Q.   How many commands to stop did you make before he heeded**

19  **the command?**

20  A.   Several commands.

21  **Q.   What was the incident that happened that finally made him**

22  **heed your command to stop?**

23  A.   That I mentioned that I was gonna Taser.

24  **Q.   And then once he complied with your command to stop, what**

25  **happened next?**

1 A.  As soon as I told him that I was gonna Taser him,

2 defendant stopped, put his hands up.  He turned around.  I,

3 you know, gave him commands to get on the ground, get on his

4 stomach.  Defendant complied.

5        At that point I approached defendant.  I holstered my

6 Taser.  I patted him down for weapons, for weapons' sake.  At

7 that point I asked the defendant why he ran from me, and

8 defendant stated that he was on probation.

9 **Q.  This initial pat-down that you did, was that a thorough**

10 **pat-down?**

11 A.  No, it was not.

12 **Q.  And what kind of pat-down was it?**

13 A.  It was just a pat-down for weapons.

14 **Q.  And after you were able to do that pat-down for weapons,**

15 **what did you do next?**

16 A.  After that I put him in handcuffs.

17 **Q.  And what did you do after that?**

18 A.  After I put him in handcuffs, I got him up to his feet and

19 we walked back towards the marked police vehicle.

20 **Q.  And so in Government's Exhibit 5, you're walking in which**

21 **direction?**

22 A.  We're walking now eastbound on 11th Street, on Northwest

23 11th Street, on the sidewalk.

24 **Q.  Officer, did you notice any civilian traffic at that**

25 **point?**

1   A.   No, I did not.

2   **Q.   Was there any civilian traffic on the street before you**

3   **attempted to make the stop?**

4   A.   No, I did not (sic).

5   **Q.   Did you see any civilian traffic at all that night?**

6   A.   No, I did not.

7   **Q.   Did you at one point call in the detention of the**

8   **defendant?**

9   A.   Yes, I did.

10  **Q.   And when was that?**

11  A.   That was at the same time walking back the defendant to

12  the marked vehicle.

13  **Q.   And how soon after you made the call did the other officer**

14  **arrive?**

15  A.   It must have been less than a minute.

16  **Q.   But this was after you had conducted the stop?**

17  A.   That's correct.

18  **Q.   Once you walked the defendant back to the car, what**

19  **happened next?**

20  A.   As I was walking him back to the marked police vehicle, I

21  took him to the back of my trunk of the marked police

22  vehicle.   Then I did a thorough search of the defendant.

23  **Q.   And why did you conduct that search?**

24  A.   'Cause at that point the defendant was in my custody.

25  **Q.   And what did you find?**

1   A.   When I searched him, defendant had a small plastic baggie

2   of marijuana.

3   **Q.   Did he have any other effects on his person?**

4   A.   Yes, he did.

5   **Q.   What was that?**

6   A.   He had his wallet.

7   **Q.   And what did you do with the defendant, if anything, after**

8   **that?**

9   A.   As I was -- once I finished searching the defendant,

10  defendant was placed into the back of my marked police

11  vehicle.

12  **Q.   What did you do next?**

13  A.   At that point my supervisor was already getting there.  My

14  supervisor was watching the defendant while he was inside my

15  trunk of the vehicle -- correction, inside the back seat of

16  my --

17          MR. LANGLEY:  That's a correction, Your Honor.

18          MS. O'CONNOR:  I have a motion regarding that if he

19  was really in the trunk.

20          THE COURT:  It sounds to me like your client would

21  have a lawsuit if he was put in the trunk.  But that's another

22  story.

23  BY MR. LANGLEY:

24  **Q.   So that was the back of the police cruiser in the seat?**

25  A.   Of the marked police vehicle, yes.

1          As my supervisor was watching him, I went to

2     investigate what the defendant put in that wheel well.

3     **Q.   Okay.  I'm going to hand you what has been introduced as**

4     **Government's Exhibit 6.**

5              **Officer Couto, do you recognize Government's Exhibit**

6     **6?**

7     A.   Yes, I do.

8     **Q.   And what is that?**

9     A.   It is a picture of the Ford Explorer with a brown small

10    handgun.

11    **Q.   And does this photo fairly and accurately depict what you**

12    **saw when you went to investigate the wheel well of the Ford**

13    **Explorer?**

14    A.   Yes.

15    **Q.   Has it been altered or changed in any manner that would**

16    **clearly affect what you saw that night?**

17    A.   No.

18    **Q.   When you saw the firearm on the top of the tire of the**

19    **Ford Explorer, what did you do?**

20    A.   At that point I advised my supervisor what I had.  At that

21    point another officer was arriving.  The supervisor then was

22    making contact to the ATF agent.

23    **Q.   I'm going to show you what has been marked as Government's**

24    **Exhibits 7 and 8.**

25              **Officer Couto, do you recognize Government's Exhibits**

1  **7 and 8?**

2  A.  Yes.

3  **Q.  What is Government Exhibit 7?**

4  A.  It's a closeup of the brown handgun on top of the right

5  wheel.

6  **Q.  And what is Government's Exhibit 8?**

7  A.  It's a picture of the brown handgun.

8  **Q.  Are Government's Exhibits 7 and 8 fair and accurate**

9  **depictions of both the gun on the wheel well and the gun that**

10  **was recovered on top of the wheel well?**

11  A.  Yes.

12            THE COURT:  Okay.  When we're talking about a wheel

13  well, to a layperson such as myself, would we also call that a

14  tire?

15            THE WITNESS:  Correct.

16            THE COURT:  So the gun is on top of a tire.

17            THE WITNESS:  Yes.

18            THE COURT:  In the wheel well.

19            THE WITNESS:  Yes.

20            THE COURT:  Okay.  I just wanted to clarify that.

21            MR. LANGLEY:  Thank you, Your Honor.

22            THE COURT:  Thank you.

23  BY MR. LANGLEY:

24  **Q.  Did you touch the gun at any point, Officer Couto?**

25  A.  I did not.

```
1   Q.  So you didn't remove the gun from the tire?
2   A.  No.
3   Q.  Did you search around the tire and the wheel well and the
4   area surrounding both the tire and the wheel well?
5   A.  Yes.
6   Q.  Did you uncover anything else?
7   A.  No.
8   Q.  What did you do next?
9   A.  At that point Officer Vaquez came by and stood by the
10  firearm.
11          THE COURT:  Before we get to that, you said you
12  didn't recover anything else.  Did you see any other objects
13  in the area that you didn't recover?
14          THE WITNESS:  No, I did not.
15          THE COURT:  Okay.
16  BY MR. LANGLEY:
17  Q.  Did at some point you call an ID unit?
18  A.  Yes, I did.
19  Q.  And what is an ID unit?
20  A.  It's a CSI.  It's our crime scene investigations unit.
21  Q.  And did they respond?
22  A.  Yes, they did.
23  Q.  And what did they do?
24  A.  They came and took photos.
25  Q.  Did they take the photos that are in Government's Exhibits
```

1   **6, 7 and 8?**

2   A.   Yes.

3   **Q.   Say it again.**

4   A.   Yes.

5          MS. O'CONNOR:  Objection to personal knowledge as to

6   Government's Exhibit 8.

7   BY MR. LANGLEY:

8   **Q.   Did you observe them take the photo in Government's**

9   **Exhibit 8?**

10  A.   No, I did not.

11         THE COURT:  Did you observe them take the photos in

12  Government's Exhibits 6 and 7?

13         THE WITNESS:  Yes, Your Honor.

14         THE COURT:  Okay.

15  BY MR. LANGLEY:

16  **Q.   Did at some point you discover what type of gun was**

17  **recovered?**

18  A.   Yes.

19  **Q.   And how did you do that?**

20  A.   After the fact that the ID tech was taking pictures of the

21  gun, that we ran the serial number.

22  **Q.   And what type of gun is that?**

23  A.   It is an FN Baby.

24  **Q.   What's an FN Baby?**

25  A.   The make is FN and the model is a Baby and it's a .25.  To

COUTO - Direct (Langley)

1  my recollection, I believe it's a .25 caliber.

2  **Q.  And was that gun loaded?**

3  A.  Yes, it was.

4  **Q.  Did you find out who the Ford Explorer belonged to?**

5  A.  Yes, we did.

6  **Q.  Did it belong to the defendant?**

7  A.  No, it did not.

8  **Q.  Did you speak with the defendant at any point during this**

9  **encounter?**

10  A.  Yes, I did.

11  **Q.  And what was said?**

12  A.  The defendant asked me if he can make a phone call.

13  **Q.  And what did you say?**

14  A.  I don't remember.

15  **Q.  Did you make any kind of questions regarding the facts of**

16  **the case or the facts of the incident?**

17  A.  No, I did not.

18  **Q.  Did you at some point transport the defendant to the Miami**

19  **Police Department station?**

20  A.  Yes, I did.

21  **Q.  Did you speak in the car when you were transporting him?**

22  A.  No, I did not.

23  **Q.  Did you speak at the station when you off-loaded him?**

24  A.  No, I did not.

25  **Q.  Did you at some point issue the defendant a traffic**

COUTO - Direct (Langley)

1  citation?

2  A.  Yes, I did.

3  Q.  I'm going to hand you what has been marked and admitted as

4  Government's Exhibit 9.

5          Officer Couto, do you recognize Government's Exhibit

6  9?

7  A.  Yes, I do.

8  Q.  And what is that?

9  A.  It is a traffic citation that I wrote.

10  Q.  And it's a traffic citation for who?

11  A.  The defendant, Domenick Jagne.

12  Q.  In the traffic citation, if you see halfway down, it says

13  that you wrote him a traffic citation for a violation of

14  Florida Code 316.400(1).

15          Is that the correct citation for which you were

16  intending to cite the defendant?

17  A.  No.

18  Q.  What's this citation that's on the citation?

19  A.  This citation is actually for motorcycles.

20  Q.  And what were in fact you looking to cite the defendant

21  for?

22  A.  Bicycle.

23  Q.  Do you remember what the citation is for the bicycle?

24  A.  No.

25  Q.  If I gave you an object that would refresh your

 1  **recollection, might you remember?**

 2  A.  Yes.

 3          THE COURT:  What is it you're showing the defendant?

 4  And you need to tell defense counsel or show it to defense

 5  counsel first.

 6          MS. O'CONNOR:  No objection.

 7          THE COURT:  Okay.

 8  BY MR. LANGLEY:

 9  **Q.  I'm handing you a printout from Westlaw of Florida**

10  **Statutes Annotated Section 316.2065 titled Bicycle**

11  **Regulations.  Does this refresh your recollection as to the**

12  **citation you meant to cite the defendant for?**

13  A.  Yes.

14  **Q.  And what subsection covers the citation for the**

15  **defendant?**

16          **MS. O'CONNOR:  I'm also okay with the Court taking**

17  **judicial notice of the correct --**

18          THE COURT:  Citation.

19          MS. O'CONNOR:  Yes.

20          THE COURT:  Okay.  That's fine.  But he can answer

21  the question.

22          THE WITNESS:  Subsection (7).

23          MS. O'CONNOR:  All right.  I have no further

24  questions.

25          THE COURT:  Just for clarification, did you arrest

COUTO - Direct (Langley)

1  the defendant?

2          THE WITNESS:  No, I did not.

3          THE COURT:  Why did you transport him to the City of

4  Miami police station?

5          THE WITNESS:  For the ATF agent to interview him at

6  our homicide office.

7          MS. MEDITIS:  Your Honor, before tendering the

8  witness, I think we may have a few more questions for him.

9          THE COURT:  Okay.  I'll let Mr. Langley consult with

10 you.

11         And before he begins, let me ask you, officer, when

12 did you write up this citation?

13         THE WITNESS:  As I was -- the defendant was in the

14 back seat of my marked police vehicle.  The officer was

15 watching the firearm until our ID tech was there, and also I

16 was on the rear of my marked police vehicle writing the

17 citation.

18         THE COURT:  Okay.  And how did you get the

19 information regarding the defendant's address, date of birth

20 and all of the other information that's in the citation?

21         THE WITNESS:  This information was relayed to me by

22 another officer.

23         THE COURT:  Who was that other officer.

24         THE WITNESS:  Officer Vaquez.

25         THE COURT:  How do you spell that?

COUTO - Direct (Langley)

1           THE WITNESS:  V-a-q-u-e-z.

2           THE COURT:  P as in "Peter" or B as in "boy"?

3           THE WITNESS: "Victor."  V as in "Victor." Victor, v.

4   As in Victor.

5           THE COURT:  Oh, V as in "Victor."  Okay.  V-a --

6           THE WITNESS:  Q as in "Quebec," "uniform" --

7           THE COURT:  Okay.  And do you know how Officer Vaquez

8   got that information?

9           THE WITNESS:  Through our computer, our MDC.

10          THE COURT:  I'm sorry.  I don't understand.

11          THE WITNESS:  Our mobile data terminal.

12          THE COURT:  And how did he know what to enter into

13  the MDT or is it MDC?

14          THE WITNESS:  MDT.

15          THE COURT:  Okay.  And how did he know what to put

16  into the MDT, if you know?

17          THE WITNESS:  I don't know.

18          THE COURT:  Okay.  Thank you.

19  BY MR. LANGLEY:

20  **Q.  Officer Couto, when you wrote the citation, was that**

21  **before or after ATF had arrived on the scene?**

22  A.  I don't remember.

23  **Q.  Let's go back to when the ID, the CSI unit came out.  You**

24  **mentioned that they had taken some pictures.**

25  A.  Yes.

COUTO - Direct (Langley)

1  **Q.   Was there anything else that the ID team did?**

2  A.   Yes, they did.

3  **Q.   What was that?**

4  A.   Myself, the ID tech and also Agent Horn, we did an

5  approximate estimation from where the defendant -- from the

6  right wheel of that vehicle to where I approximately detained

7  defendant.

8  **Q.   And what was that distance, approximately?**

9  A.   Approximately 192 feet.

10  **Q.   Is it a crime to run from the police?**

11  A.   Yes.

12  **Q.   And is it a crime --**

13           MS. O'CONNOR:  Objection as to testimony of a legal

14  conclusion.

15           THE COURT:  I'll sustain.  You can make argument

16  regarding that later on.

17           MR. LANGLEY:  Yes, Your Honor.

18  BY MR. LANGLEY:

19  **Q.   From your vantage point, were you going to arrest the**

20  **defendant before finding the gun?**

21  A.   Yes.

22  **Q.   And what were you going to arrest him for?**

23  A.   Resisting.

24  **Q.   And why did you eventually arrest the defendant?**

25  A.   I did not.

COUTO - Direct (Langley)

1   **Q.   Why not?**

2   A.   'Cause the ATF agent took the defendant into custody.

3   **Q.   Why did you call ATF?**

4   A.   My supervisor called ATF.

5   **Q.   If you're aware of why your supervisor called ATF, why was**

6   **that?**

7   A.   'Cause there was a firearm involved.

8   **Q.   Please explain.**

9   A.   More than likely, every time we have a case of a firearm

10  involved, we try to contact an ATF agent.

11  **Q.   You said during the search of the defendant you found a**

12  **wallet on his person, is that correct?**

13  A.   Yes.

14  **Q.   Did you find an ID in the wallet?**

15  A.   I don't recall.

16  **Q.   At any point, once you discovered the gun, did any of the**

17  **officers check the defendant's criminal history?**

18  A.   I believe so, yes.

19  **Q.   And what did that check of his criminal history reveal?**

20  A.   Officer Vaquez relayed the information that the defendant

21  was a convicted felon.

22          MS. O'CONNOR:   If I may have one moment.

23  BY MR. LANGLEY:

24  **Q.   Officer Couto, do you know how Officer Vaquez got the**

25  **defendant's name to run his criminal history?**

COUTO - Direct (Langley)

37

1  A.  I don't.

2  **Q.  Officer Couto, you did say that you were going to arrest**

3  **the defendant for finding the gun and you explained that you**

4  **were going to arrest him for resisting.  At what point was he**

5  **resisting?**

6  A.  At which point that I was giving him verbal commands to

7  stop.

8  **Q.  Could it be that --**

9         MS. O'CONNOR:  Objection to leading.

10         THE COURT:  Sustained.

11  BY MR. LANGLEY:

12  **Q.  Is it or is it not an arrestable offense to flee from an**

13  **officer?**

14         MS. O'CONNOR:  Objection to leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes.

17  BY MR. LANGLEY:

18  **Q.  Is that why you were going to arrest the defendant?**

19         MS. O'CONNOR:  Objection to leading.

20         THE COURT:  Sustained.

21         His subjective motivations are irrelevant anyway as

22  whether the facts would lead a reasonable officer to believe

23  an offense was committed.  He has given his testimony, however

24  it was.

25         MR. LANGLEY:  Thank you, Your Honor.  I have no

1  further questions.

2          THE COURT:  Okay.  And I have a question.

3          What was the purpose of the search that you conducted

4  of him at the police car?

5          THE WITNESS:  At that point the defendant was in my

6  custody.

7          THE COURT:  So he had in effect been arrested,

8  although you didn't complete the arrest.  Is that what you're

9  saying?

10          THE WITNESS:  That's correct, Your Honor.

11          THE COURT:  And for what offense was he in your

12  custody at that time?

13          THE WITNESS:  At that point he was resisting without

14  violence.

15          THE COURT:  Okay.  When you say he was resisting

16  without violence, what was he resisting without violence?

17          THE WITNESS:  My lawful commands to stop.

18          THE COURT:  Okay.

19          MR. LANGLEY:  The Government tenders the witness.

20                    CROSS-EXAMINATION

21  BY MS. O'CONNOR:

22  **Q.  Good morning, Officer Couto.**

23  A.  Good morning.

24  **Q.  Am I saying that right?**

25  A.  Yes.

COUTO - Cross (O'Connor)

1   Q.  Okay.  So I want to take you back to the beginning of your

2   shift that night, and you said it began at 9:00 p.m.?

3   A.  That's correct.

4   Q.  They give the midnight shift to rookies, huh?

5   A.  It is what it is.

6   Q.  Okay.  So Mr. Langley asked you a little bit about your

7   roll call and the meeting that you had at the beginning of

8   that shift.  Do you remember that?

9   A.  Yes.

10  Q.  And you said that a roll call is where the patrol officers

11  will meet with their supervisors before going on duty, right?

12  A.  Correct.

13  Q.  And that occurred about 9:00 p.m.?

14  A.  Correct.

15  Q.  At the meeting, is it patrol officers only in Overtown who

16  are present at that meeting?

17  A.  No.

18  Q.  From what areas?

19  A.  From all the four zones of central.

20  Q.  Which are what?

21  A.  Allapattah, Wynwood, Overtown and downtown.

22  Q.  And would you describe those other areas similar to the

23  way you would describe Overtown?

24          MS. MEDITIS:  Objection.  Vague.

25          THE COURT:  Sustained.

1  BY MS. O'CONNOR:

2  **Q.   How would you describe Allapattah?**

3  A.   Big.

4  **Q.   And when Mr. Langley asked you to describe Overtown, you**

5  **said it was a predominantly black neighborhood.  Would you say**

6  **the same for Allapattah?**

7  A.   I don't work Allapattah.

8  **Q.   Okay.  So you have no knowledge about the racial makeup of**

9  **Allapattah or Wynwood or those other areas you just mentioned?**

10             MS. MEDITIS:  Objection.  Relevance.

11             THE COURT:  Sustained.

12             MS. O'CONNOR:  I'm sorry.  Are you both going to be

13  objecting?

14             MS. MEDITIS:  Whatever the Court's order is, Your

15  Honor.

16             THE COURT:  Okay.  Mr. Langley, you need to object.

17             Ms. Meditis, you can nudge him if you want him to

18  object and whisper in his ear.

19             MS. MEDITIS:  Certainly, Judge.

20             MR. LANGLEY:  Thank you, Your Honor.

21             MS. O'CONNOR:  That's how I usually get my

22  objections, Judge, someone next to me.

23  BY MS. O'CONNOR:

24  **Q.   So you met with the patrol officers from these areas and**

25  **you said a supervisor was there.**

1  A.  Correct.

2  **Q.  Who was that supervisor?**

3  A.  Sergeant Hicks.

4  **Q.  Sergeant Hicks.  Any other supervisors?**

5          MR. LANGLEY:  Objection, Your Honor.  Relevance.

6          THE COURT:  Overruled.

7          THE WITNESS:  I don't recall.

8  BY MS. O'CONNOR:

9  **Q.  Okay.  But Sergeant Hicks, does he oversee the patrol**

10 **officers in those areas?**

11 A.  She.

12 **Q.  She.  That's sexist of me.**

13 A.  She supervises Overtown.

14 **Q.  She supervises Overtown.  But she, nonetheless, was giving**

15 **you instructions or she was conducting the roll call for you**

16 **and you're patrolling -- I'm sorry.**

17         THE COURT:  And he's patrolling Overtown.  Very good,

18 Ms. O'Connor.

19         MS. O'CONNOR:  Thank you.  I'm a little slow today,

20 Judge.  Maybe I didn't have my coffee.

21 BY MS. O'CONNOR:

22 **Q.  So Sergeant Hicks talked to you about a recent crime**

23 **spate.  Do you remember testifying to that on direct?**

24 A.  Correct.

25 **Q.  And that was a crime spate -- what kind of crime spate?**

1  A.  Robberies, burglaries and also assaults.

2  **Q.  And that's in the Overtown area?**

3  A.  That's correct.

4  **Q.  And a crime spate means a spike in those crimes?**

5  A.  Correct.

6  **Q.  And when did that crime spate occur or begin?**

7  A.  I don't know.

8  **Q.  But this was the first time you had heard about it on this**

9  **night?**

10 A.  I don't recall.

11 **Q.  So it could be that you had been instructed similarly on**

12 **previous occasions?**

13         MR. LANGLEY:  Objection, Your Honor.  Asked and

14 answered.

15         THE COURT:  Overruled.

16         THE WITNESS:  Rephrase it.

17 BY MS. O'CONNOR:

18 **Q.  It could be that you had been informed about this crime**

19 **spate on other occasions.**

20 A.  I don't recall.

21 **Q.  Okay.  Sergeant Hicks told you about the MO of the people**

22 **who were suspects in these crimes, correct?**

23 A.  Yes.

24 **Q.  And Sergeant Hicks told you that the MO was that these**

25 **people were black males on bicycles, right?**

1  A.  Correct.

2  **Q.  What else did Sergeant Hicks tell you about their MO?**

3  A.  That's all.

4  **Q.  That's all.  The entirety of the description or the MO is**

5  **that they're black males on bicycles.**

6  A.  Correct.

7  **Q.  And this is what you had in your mind as you were starting**

8  **your shift.**

9  A.  Yes.

10  **Q.  And Sergeant Hicks was talking to you in particular about**

11  **Overtown, correct?**

12  A.  Yes.

13  **Q.  But did the officers from these other areas get the same**

14  **instruction?**

15          MR. LANGLEY:  Objection, Your Honor.  Relevance as to

16  the instructions to other officers.

17          THE COURT:  Overruled.  You brought up what happened

18  at roll call, so she's entitled to inquire into it to a

19  limited extent.  But, obviously, his subjective motivations or

20  intents are largely irrelevant anyway other than for perhaps

21  background.

22          So you can answer the question.  Did the officers

23  from other areas get the same instruction at roll call?

24          THE WITNESS:  I don't recall.

25          MS. O'CONNOR:  Your Honor, actually in certain

 1  limited circumstances, subjective intent does matter and I

 2  will refer to a case that I haven't read in a while, but it's

 3  Whren.

 4          THE COURT:  Right.

 5          MS. O'CONNOR:  And I believe there's a footnote in

 6  that case, and that's what I'm talking about here.

 7          THE COURT:  I don't recall the footnote in Whren.  I

 8  recall the Whren case standing basically for the proposition

 9  the subjective motivations of an officer in making a traffic

10  stop is irrelevant to the determination as to whether there's

11  probable cause to believe that the violation occurred.

12          MS. O'CONNOR:  There is an exception laid out in

13  Whren for certain characteristics that would not be okay if

14  the officer had that subjective intent.

15          THE COURT:  So you're talking about racial

16  motivation.

17          MS. O'CONNOR:  That's correct.

18          THE COURT:  And this hearing is not about racial

19  motivation.

20          MS. O'CONNOR:  No, Your Honor.  But I wasn't

21  anticipating this.

22          THE COURT:  Okay.  Well, I overruled the objection

23  and I said he could answer.  So I don't know why we're having

24  the discussion.

25          MS. O'CONNOR:  Sure.  I understand.

1  BY MS. O'CONNOR:

2  **Q.  At this meeting Sergeant Hicks also instructed you that if**

3  **you saw a black male on a bicycle who was violating any**

4  **traffic laws, you should stop them, correct?**

5           MR. LANGLEY:  Objection, Your Honor.  That was not

6  the testimony of the officer.

7           MS. O'CONNOR:  Well, he can tell me.

8           THE COURT:  Overruled.  She asked if that was

9  correct, and he can clarify whether that was correct or not.

10  She's entitled to ask leading questions since it's cross.

11           THE WITNESS:  No.

12  BY MS. O'CONNOR:

13  **Q.  What did they tell you?**

14  A.  This was just for us to be on the lookout for.

15  **Q.  To be on the lookout for.**

16  A.  Correct.

17  **Q.  Robbery suspects.**

18  A.  Yes.

19  **Q.  Who were black males on bikes.**

20  A.  Yes.

21  **Q.  And I want to fast-forward a little bit.**

22           **Actually, I believe you testified on direct that if**

23  **there was no headlight on a bicycle, you would stop somebody**

24  **on a bicycle for their safety, correct?**

25  A.  Correct.

1   Q.  And you discussed that at the same meeting, that you

2   discussed at your roll call meeting.

3   A.  I don't recall.

4   Q.  That was your testimony on direct.  Do you remember that?

5   A.  Rephrase it.

6   Q.  That at this very same roll call meeting where Sergeant

7   Hicks provided you with the MO, you also discussed that if

8   somebody didn't have a headlight, you would stop that person

9   for their safety.

10  A.  I don't recall.

11  Q.  Okay.  I want to fast-forward a little bit to the first

12  moment you saw Mr. Jagne.

13          Had you ever seen him before?

14  A.  No, I had not.

15  Q.  Have you ever heard the name Domenick Jagne?

16  A.  No, I did not.

17  Q.  But Domenick Jagne is black, correct?

18  A.  Yes.

19  Q.  Okay.  So the first moment you saw him, you saw him riding

20  a bike, correct?

21  A.  That's correct.

22  Q.  And you observed that he was a black male, correct?

23  A.  That's correct.

24  Q.  And this was around 11:00 p.m., correct?

25  A.  Yes.

COUTO - Cross (O'Connor)

1  Q.  Just about two hours after you had this roll call with

2  Sergeant Hicks, correct?

3  A.  Yes.

4  Q.  At which roll call she informed you to be on the lookout

5  for black men on bicycles, correct?

6  A.  Yes.

7  Q.  And you had that in your head when you saw Mr. Jagne, a

8  black man on a bicycle.

9  A.  I don't recall.

10  Q.  And when you first observed Mr. Jagne, you didn't see like

11  a bulge in his clothing or anything like that, correct?

12  A.  No.

13  Q.  You couldn't see that there was marijuana in his pocket,

14  correct?

15  A.  No.

16  Q.  You couldn't see any indication that he had a gun on him,

17  correct?

18  A.  Correct.

19  Q.  And there was no indication, based on Mr. Jagne's conduct,

20  that he had recently been involved in a robbery or an assault

21  or in a crime of any sort, correct?

22  A.  Correct.

23  Q.  And there was no indication that he was planning on

24  committing a robbery or an assault or any of these other

25  crimes that comprised the recent spate, correct?

COUTO - Cross (O'Connor)

```
 1  A.  I don't know.
 2  Q.  Well, did you see any sign that he was about to rob
 3  somebody?
 4  A.  I don't recall.
 5  Q.  You don't recall.  So as you sit here today, maybe he
 6  looked like he was about to rob somebody.
 7          MS. MEDITIS:  Objection, Your Honor.
 8          THE COURT:  Overruled.
 9          THE WITNESS:  I don't know.
10  BY MS. O'CONNOR:
11  Q.  You don't remember?
12  A.  I do.
13  Q.  You do remember.
14  A.  The incident, yes.
15  Q.  You remember the incident, correct?
16  A.  Yes.
17  Q.  And as you sit here today, your testimony under oath to
18  this Judge is you don't recall whether Mr. Jagne looked like
19  he was about to rob somebody.
20  A.  I don't know.
21  Q.  You don't know if you recall or you don't know if he was
22  about to rob somebody?
23  A.  I don't know if he was gonna rob somebody.
24          THE COURT:  Was there any indication when you saw him
25  that he was about to commit a crime --
```

```
 1              THE WITNESS:  No.
 2              THE COURT:  -- other than the bicycle?
 3              THE WITNESS:  No.
 4              THE COURT:  Okay.
 5   BY MS. O'CONNOR:
 6   Q.  And you were in a marked car that day.
 7   A.  Yes.
 8   Q.  And you were wearing your uniform?
 9   A.  Yes.
10   Q.  Similar to the uniform you have right now?
11   A.  Yes.
12   Q.  And you said that while you're in your car you had your
13   windows down, right?
14   A.  Yes.
15   Q.  And you gave verbal commands for Mr. Jagne to stop,
16   correct?
17   A.  Yes.
18   Q.  And you said that he swerved towards the curb of the
19   street, correct?
20   A.  He veered off to the right, yes.
21   Q.  And you saw him lay down his bike, correct?
22   A.  Yes.
23   Q.  And you were still in your patrol car at that point,
24   right?
25   A.  No.
```

1  Q.  **You were already out of your patrol car?**

2  A.  At the same time he was putting the bicycle down.

3  Q.  **You were getting out of your patrol car.**

4  A.  Yes.

5  Q.  **And then you said he darted to the passenger side of the**

6  **vehicle, correct?**

7  A.  Yes.

8  Q.  **And you did not see any contraband in his hand, correct?**

9  A.  Correct.

10 Q.  **You did not see a gun, correct?**

11 A.  Correct.

12 Q.  **You didn't see any other thing that you knew to be**

13 **illegal.**

14 A.  Correct.

15 Q.  **In fact, it's not illegal to dart towards a car.**

16 A.  No.

17 Q.  **But you unholstered your weapon at that point.**

18 A.  Yes.

19 Q.  **And Mr. Jagne ran.**

20 A.  Yes.

21 Q.  **And you ran after him.**

22 A.  Yes.

23 Q.  **Why?**

24 A.  'Cause at that point I had told him -- you know, I gave

25 him commands, once he began running, I'm in full marked -- in

 1  full uniform and I'm giving him lawful commands to stop

 2  running.

 3  **Q.  Before Mr. Jagne stopped running, did you believe you were**

 4  **permitted to arrest him?**

 5  A.  Rephrase the question.

 6  **Q.  Before Mr. Jagne started running, did you believe you were**

 7  **permitted to arrest him?**

 8          MR. LANGLEY:  Objection as to a legal conclusion,

 9  Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  Say that question again, please.

12  BY MS. O'CONNOR:

13  **Q.  Before Mr. Jagne started running --**

14  A.  Uh-huh.

15  **Q.  -- did you believe you were permitted to arrest him?**

16  A.  No.

17  **Q.  When he started running, you believed you were permitted**

18  **to arrest him then?**

19  A.  Yes.

20  **Q.  Now, when you were running after him, you unholstered your**

21  **Taser, correct?**

22  A.  Yes.

23  **Q.  And you warned Mr. Jagne that if he kept running, you were**

24  **going to use your Taser.**

25  A.  Yes.

1   Q.   And that would have been to effect the stop of Mr. Jagne.

2   A.   Yes.

3   Q.   And at that point you believed you were authorized to use

4   your Taser to stop Mr. Jagne.

5   A.   Yes.

6   Q.   Have you ever used your Taser before?

7   A.   No.

8   Q.   Have you ever been involved in an incident involving the

9   use of a Taser?

10  A.   Yes.

11  Q.   On direct you were asked about the civilian traffic that

12  night, correct?

13  A.   Yes.

14  Q.   And you said there was no civilian traffic at all that

15  night.

16  A.   To my knowledge.

17  Q.   That you saw.

18  A.   Yes.

19  Q.   And you had been patrolling that area for two hours at

20  that point.

21  A.   Yes.

22  Q.   And there had been no civilian traffic.

23  A.   To my knowledge, no.

24  Q.   So you didn't see anybody else out on the street?

25  A.   Not at that time, no.

```
 1    Q.   No.   I mean that night.
 2    A.   That's not the only area that I was patrolling.
 3    Q.   I'm talking about in that area.   On direct you testified
 4    you didn't see any civilian traffic at all that night.
 5    A.   In that time of the incident I did not.
 6    Q.   Okay.   At all that night.   That night, between 9:00 and
 7    11:00, was there other civilian traffic in that area that you
 8    saw?
 9    A.   I started my patrol at 9:30 after roll call.
10    Q.   Between 9:30 and 11:00, was there any civilian traffic in
11    that area that you saw?
12    A.   I don't remember.
13              THE COURT:   Was there civilian traffic in any area
14    that you saw at all between 9:30 and 11:00?
15              THE WITNESS:   I don't recall.
16              THE COURT:   Okay.
17    BY MS. O'CONNOR:
18    Q.   And when you finally did stop Mr. Jagne, you took him down
19    to the ground, correct?
20    A.   No.
21    Q.   You didn't.
22    A.   No.
23    Q.   You didn't testify on direct that you took him down to the
24    ground?
25    A.   No.
```

COUTO - Cross (O'Connor)

1    **Q.   You handcuffed him standing up?**

2    A.   No.

3    **Q.   You didn't handcuff him at that point.**

4    A.   I did handcuff him.

5    **Q.   What was he doing when you handcuffed him?  Was he on the**

6    **ground or was he standing up?**

7    A.   He was laying face down on his stomach.

8    **Q.   So you did take him down to the ground.**

9    A.   No, I did not.

10   **Q.   How did he get down to the ground?**

11   A.   Complying to my verbal commands.

12   **Q.   He got down on the ground, correct?**

13   A.   Yes.

14   **Q.   And he was cooperative with you from that point, correct?**

15   A.   Correct.

16   **Q.   And you handcuffed him, correct?**

17   A.   Correct.

18   **Q.   Did he resist in any way at that point?**

19   A.   No, he did not.

20   **Q.   And you didn't have to deploy your Taser, correct?**

21   A.   Correct.

22   **Q.   If he had kept running, you would have deployed your**

23   **Taser, correct?**

24   A.   Possibly.

25   **Q.   At that point you did a pat-down of Mr. Jagne, correct?**

COUTO - Cross (O'Connor)

1   A.   Yes.

2   **Q.   And you didn't feel anything that aroused your suspicions,**

3   **correct?**

4   A.   Correct.

5   **Q.   You didn't feel any marijuana in his pockets.**

6   A.   Correct.

7   **Q.   You didn't feel any other contraband when you did that**

8   **pat-down.**

9   A.   Correct.

10  **Q.   And then you brought him back to your patrol car, correct?**

11  A.   Yes.

12  **Q.   But first did you call for backup?**

13  A.   No.

14  **Q.   You just brought him back to your patrol car?**

15  A.   Correct.

16  **Q.   And at that point did you call for backup?**

17  A.   No.

18  **Q.   When did you call for backup?**

19  A.   I did not.

20  **Q.   You didn't.**

21  A.   No.

22  **Q.   What brought the other officers to the scene?**

23  A.   I advised on the radio that I have one detained and I gave

24  them the address where I was at.

25  **Q.   And to you that's not calling for backup?**

COUTO - Cross (O'Connor)

1    A.  It's not.

2    **Q.  When did you advise over the radio that you had one**

3    **detained and advise them of your location?**

4    A.  As I was walking back towards the marked police vehicle

5    with the defendant.

6    **Q.  You're enroute when you did that.**

7    A.  Correct.

8    **Q.  And then you brought him back to your patrol car.**

9    A.  Yes.

10   **Q.  But before you did that, you said, why did you run.**

11   A.  Yes.

12   **Q.  And he said, because I have marijuana in my pocket.**

13   A.  No.

14   **Q.  What did he say?**

15   A.  'Cause I'm on probation.

16   **Q.  He did not say because I have weed.**

17   A.  I don't recall.

18   **Q.  And then when you were at the patrol car, you patted him**

19   **down again, correct?**

20   A.  Correct.

21   **Q.  And you went through his pockets.**

22   A.  Yes.  Correct.

23   **Q.  Why did you go through his pockets?**

24   A.  'Cause at that point he was in my custody.

25   **Q.  He was under arrest at that point?**

1  A.  Correct.

2  **Q.  For what?**

3  A.  Resisting without violence.

4  **Q.  Resisting arrest without violence.**

5  A.  Correct.

6  **Q.  He was under arrest for resisting arrest.**

7  A.  Resisting without violence.

8  **Q.  Without violence.**

9  A.  Correct.

10 **Q.  What was the justification for the underlying arrest?**

11 A.  That is the justification.

12 **Q.  And you searched his pockets, correct?**

13 A.  Correct.

14 **Q.  And you found marijuana, correct?**

15 A.  Correct.

16        MS. O'CONNOR:  May I have a moment, Your Honor?

17        THE COURT:  Yes.

18 BY MS. O'CONNOR:

19 **Q.  I want to take you back to the initial questions that you**

20 **asked Mr. Jagne upon him being placed in handcuffs.**

21        **You testified a moment ago that you don't recall**

22 **whether Mr. Jagne told you he had a bag of weed in his pocket.**

23 A.  Correct.

24 **Q.  Do you recall creating a report about this incident?**

25 A.  Yes.

1  Q.   Okay.  And you created this report the night of the

2  incident?

3  A.   Correct.

4  Q.   When your memory was better, correct?

5  A.   Correct.

6  Q.   And on that report you said, quote --

7           (Inaudible conversation among counsel)

8  Q.   You said, "Defendant was asked why he fled from this

9  officer and defendant stated he had a bag of weed on his

10 persons" (sic).

11          Is that what you wrote in the report?

12 A.   If that's what it says, yes.

13 Q.   Well, would you like to refresh your recollection?

14 A.   Yes.

15 Q.   Sure.

16          Does that refresh your recollection about what

17 Mr. Jagne actually responded to you in response to your

18 question?

19 A.   Yes.

20 Q.   And he didn't talk about probation but he talked about a

21 bag of weed in his pocket.

22 A.   I don't recall.

23 Q.   You don't recall.

24 A.   I understand that I wrote that he had a bag of weed.  But

25 I also do recall him saying him on probation.

1    Q.   Okay.  But you try to make your reports as accurate as
2    possible, correct?
3    A.   Of course.
4    Q.   And you write them close to the incident because that's
5    when your memory is best, right?
6    A.   Of course.
7    Q.   And it's been a couple of months since this incident now,
8    correct?
9    A.   Yes.
10   Q.   And would you say your recollection of the events of that
11   night are better the night of or a few months later?
12   A.   The night of.
13   Q.   Right.  And on this report that you wrote the night of,
14   you mentioned his response was that he had weed in his pocket,
15   correct?
16   A.   Yes.
17   Q.   And you didn't write anything about him saying he was on
18   probation, correct?
19   A.   I did not.
20   Q.   Now, who responded to the scene?
21   A.   Sergeant Blackerby and Officer Vaquez.
22            THE COURT:  Sergeant who?
23            THE WITNESS:  Blackerby.
24            THE COURT:  Can you spell that?
25            THE WITNESS:  Yes.  B as in bravo-lima-alpha-

1    Charlie-kilo -- B-l-a-c-k-e-r-b-y.

2    BY MS. O'CONNOR:

3    **Q.   Did they arrive together?**

4    A.   No.

5    **Q.   Did they arrive at the same time?**

6    A.   No.

7    **Q.   Who arrived first?**

8    A.   Sergeant Blackerby.

9    **Q.   And what did Sergeant Blackerby do when he got there?**

10   A.   I had advised him on what happened.

11   **Q.   And what did he do?**

12   A.   As I was putting the defendant back into the backseat of

13   my marked police vehicle, he was observing the defendant as I

14   was investigating on what the defendant put on top of the

15   right tire.

16   **Q.   So before Officer Blackerby got there, you had not gone to**

17   **investigate the gun on the wheel.**

18   A.   Correct.

19   **Q.   And before you went to investigate the gun on the wheel,**

20   **you had already put Mr. Jagne in the back of your patrol car.**

21   A.   Correct.

22   **Q.   And Officer Blackerby's job was to keep an eye on**

23   **Mr. Jagne, correct?**

24   A.   Correct.

25   **Q.   And it was only then that you went and looked at the wheel**

COUTO - Cross (O'Connor)

1  of the car.

2  A.  Correct.

3  Q.  **What did you do when you saw the gun?**

4  A.  I advised the sergeant what I had, what I found.

5  Q.  **What sergeant?**

6  A.  Blackerby.

7  Q.  **And did you call it in over the radio?**

8  A.  I did not.

9  Q.  **When did Officer Vaquez get there?**

10  A.  After.

11  Q.  **After what?**

12  A.  Moments later that we found the gun.

13  Q.  **And was he the next to arrive?**

14  A.  Yes.

15  Q.  **Who arrived after that?**

16  A.  I don't recall.

17  Q.  **Who else was on the scene?**

18  A.  ATF Agent Horn and ID Tech Menendez.

19  Q.  **That's all?**

20  A.  To my recollection, yes.

21  Q.  **Did you transport Mr. Jagne back to the station?**

22  A.  Yes, I did.

23  Q.  **But you were there you said when ID Tech Menendez took the**

24  **photos of the gun?**

25  A.  Yes.

COUTO - Cross (O'Connor)

1    **Q.  You saw that happen?**

2    A.   Yes.

3    **Q.  Now, I want to back up a little bit to when you were**

4    **getting -- you said that when Mr. Jagne was getting off his**

5    **bike, you were getting out of your car as well, correct?**

6    A.   Correct.

7    **Q.  And that would be, obviously, on the left side of your**

8    **vehicle, correct?**

9    A.   Correct.

10   **Q.  And your vehicle was parked behind where the photographer**

11   **was parked in one of the Government's exhibits, correct?  We**

12   **already talked about that.**

13   A.   Correct.

14   **Q.  Government's 3, correct?**

15   A.   Correct.

16   **Q.  And when you saw Mr. Jagne make this darting motion**

17   **towards the car, where were you?**

18   A.   I was already by the front of my vehicle.

19   **Q.  You were at the front, like by the front wheel of your**

20   **vehicle?**

21   A.   The front right wheel, correct.

22   **Q.  The front right wheel.**

23   A.   By the fender, by the front right fender.

24   **Q.  On the driver's side?**

25   A.   No, passenger side.

COUTO - Cross (O'Connor)

1  Q.  So you got out of your car, correct?

2  A.  I went around and in front.

3  Q.  You went up to the front left side of the car, correct?

4  A.  Correct.

5  Q.  And what you're saying is you took a right turn to the

6  right side of the front of the car.

7  A.  Correct.

8  Q.  Before you asked Mr. Jagne why he fled from you, you did

9  not read him his Miranda rights.

10 A.  I did not.

11 Q.  And did you at any point read him his Miranda rights?

12 A.  I did not.

13 Q.  Did you see anybody else read him his Miranda rights?

14 A.  No.

15 Q.  You transported him from the scene to homicide?

16 A.  That's correct.

17 Q.  Why homicide?

18 A.  'Cause that's where Agent Horn interviewed them --

19 interviewed the defendant.

20 Q.  Was Mr. Jagne a suspect in any homicide?

21 A.  No.

22 Q.  Was he a suspect in any other crime?

23 A.  No.

24 Q.  Did you see ID Tech Menendez take photographs of Mr. Jagne

25 as well?

COUTO - Cross/Redirect

```
 1   A.  Correct.

 2   Q.  And she took photographs -- a lot of them were of his

 3   hands.  Did you see that?

 4   A.  Correct.

 5   Q.  Why can did she do that, if you know?

 6   A.  I don't know.

 7           MS. O'CONNOR:  May I have a moment?

 8           THE COURT:  Yes.

 9           MS. O'CONNOR:  No further questions.

10           THE COURT:  Any redirect, Mr. Langley?

11           MR. LANGLEY:  Briefly, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MR. LANGLEY:

14   Q.  Officer Couto, on cross defense counsel asked is it

15   illegal to put something on a car wheel.  Do you remember

16   that?

17   A.  Yes.

18   Q.  When the defendant put his hand towards the wheel of the

19   car, was it or was it not suspicious to you?

20   A.  Yes.

21   Q.  Yes what?

22   A.  It was suspicious.

23   Q.  Did it or did it not cause you any concern --

24           MS. O'CONNOR:  Objection to leading.

25           THE COURT:  Sustained.
```

COUTO - Redirect (Langley)

1  BY MR. LANGLEY:

2  **Q.  What type of reaction did you have when you saw him place**

3  **his hand in the wheel well?**

4  A.  I did not know what he had inside his hand.

5  **Q.  Did you have any kind of reaction to that?**

6  A.  Yes.

7  **Q.  And what was that?**

8  A.  That's when I unholstered my weapon.

9  **Q.  And why did you do that?**

10 A.  For officer safety.  I did not know what he was putting

11 inside that wheel well.

12 **Q.  And whose officer's safety?**

13 A.  Myself.

14 **Q.  Was that a concern of yours?**

15 A.  Yes.

16 **Q.  Backing up a little bit, you said that as the defendant**

17 **was darting towards the passenger side of the Ford Explorer,**

18 **that you were getting out of the car and that you initially**

19 **went to the left side of the fender.  Do you remember that?**

20 A.  I think I said to the right.

21 **Q.  You went to the left and then to the right?**

22 A.  Correct.

23 **Q.  Did you move in a --**

24         MS. O'CONNOR:  Objection to leading.

25 **BY MR. LANGLEY:**

1  Q.  Your testimony is that you moved in a 90-degree angle.  Is
2  that how you moved?
3  A.  That's correct.
4  Q.  Defense counsel asked about you bringing the defendant to
5  the homicide division.  Does bringing him to a homicide
6  division indicate that he committed a homicide?
7  A.  No.
8  Q.  There was some confusion as to whether the resisting
9  arrest without violence was itself a separate offense.  Do you
10 remember that questioning?
11 A.  Yes.
12 Q.  Is it or is it not a separate offense for fleeing and
13 eluding an officer?
14 A.  Correct.
15 Q.  The nonviolent resisting arrest, is there or is there not
16 a part of that charge that's failure to heed an officer's
17 command to stop?
18         MS. O'CONNOR:  Objection to leading.
19         THE COURT:  Sustained.
20         MR. LANGLEY:  One moment, Your Honor.
21         No further questions, officer.
22         THE COURT:  Okay.  Let me just look at my notes for a
23 minute.
24         Can you describe what the homicide section of the
25 police office looks like?  Is it like clearly marked homicide

COUTO - Redirect (Langley)

1  or is there something special about that particular section of

2  that particular police station?

3           THE WITNESS:  It's where the agent was able to do her

4  interview, 'cause they have an interview room.

5           THE COURT:  Okay.  And why is that interview room

6  different than any other location, if it is?

7           THE WITNESS:  I don't know.

8           THE COURT:  Excuse me?

9           THE WITNESS:  Um, to my 'knowledge, it's separate

10 from anyone else.

11          THE COURT:  Okay.  So you're saying there was a

12 private interview room there?

13          THE WITNESS:  Correct.

14          THE COURT:  Is there anything particular?  It like

15 clearly marked so that somebody who goes in there would know

16 it was homicide versus robbery versus, you know, burglaries

17 versus some other offense?

18          THE WITNESS:  Correct.

19          THE COURT:  Correct what?

20          THE WITNESS:  There's a door outside that says

21 homicide unit.

22          THE COURT:  Okay.  Is there any follow-up, first

23 Mr. Langley and then Ms. O'Connor?  Anything else from this

24 witness?

25          MR. LANGLEY:  Nothing from the Government, Your

1    Honor.

2              MS. O'CONNOR:  No.  Thank you, Judge.

3              THE COURT:  Okay.  Thank you.  You can be excused.

4    But I'll ask you to remain till the conclusion of the hearing

5    or until the Government says that you're released.

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              (Witness excused)

9        *    *    *    *    *    *    *    *    *    *

10                        I N D E X

11   WITNESS                                                    PAGE

12   COREY COUTO, GOVERNMENT WITNESS, SWORN...................... 2

13   DIRECT EXAMINATION BY MR. LANGLEY.......................... 2

14   CROSS-EXAMINATION BY MS. O'CONNOR......................... 38

15   REDIRECT EXAMINATION BY MR. LANGLEY....................... 64

16   EXHIBITS

17   Government's Exhibits 1 through 9 in evidence.............. 2

18        *    *    *    *    *    *    *    *    *    *

19                   C E R T I F I C A T E

20

21        I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23

24

25